Good morning, Mr. Neidert, members of the panel. My name is John Lambrose. I'm here on behalf of my client, Mr. Smith, and I'd like to begin my argument with the ineffective assistance of counsel claim dealing with trial counsel's failure to file or seek a motion to mistry the case after the jury came back and, within minutes of their verdict, send a note to the judge telling the judge that they were in fear of their safety because they were concerned that my client and the codefendant and his cohorts and friends, I think they identified the juror note, although the note is not in evidence, I'm taking this from Judge Griffin's statement on the record, that they were concerned about inmates that may not also be incarcerated. Again, that came within 10 minutes of their guilty verdict. And I do have citations to the record that I think are very useful for me or the record. If I don't have exact citations, I'll try to clean that up later. It's just such a huge record. If the Court's interested in that, I'll make my best efforts to make sure I'm accurate on that. But the hearing that I'm talking about took place on May the 4th, 1999, at Excerpts 3115 through 3134. While the judge was Let me ask you a question. It's my understanding from review of the record that the note was written after the verdict had already been rendered? I believe it was. And in terms of the timing, it was within minutes. I would say maybe by my calculation no more than 30 minutes, maybe within 15 or 20 minutes. But it was written after the verdict? Yes. I don't think that's of any huge consequence, Judge Smith, just because it was – I think under the I mean, if in fact it had been written before the verdict, then one may have suggested that the verdict may have been different based on the fear. But if one had written it after the verdict, I guess I'm trying to figure out what the prejudice is. Well, in a situation like this, and it is a bit complicated because this is not a, as I would say, a substantive claim. It's a derivative. It's an IAC claim. I understand. And my contention is, in a nutshell, that what counsel should have done is sought a mistrial of the entire case predicated on the fact that there was either implied or expressed bias on the part of at least one juror and probably more than one juror, given the brief canvas that occurred in front of the lawyers and then later on without the lawyers present. The jurors expressed fear. Now, fear is synonymous with bias. And under the Sixth Amendment, you cannot be – a jury cannot serve if they are biased in any way against the defendants. And I don't believe – There was no death penalty in this case, correct? There was not, but there was a sentence of life without. And that certainly was not the most lenient sentence that could have occurred. And again, I think part of that life without sentence was attributable to the tremendous prejudicial spillover from Mr. Rowland, the co-defendant in this case. Mr. Rowland was – I'm sorry. I understand what you're saying about Mr. Rowland, but let me ask you another question which concerns this particular issue. In a case we just recently had come back from the Supreme Court, Harrington v. Richter, we were pretty well chastised in that case. And we were told that the pivotal question is not whether the Strickland claim would be unreasonable to us, but whether the state court's application of the Strickland standard was unreasonable. Now, in this particular case, you've raised this to the highest court that we can look at, and you've suggested what you've had to say, and they've said it wasn't unreasonable, that it wasn't a Strickland claim. And I guess I'm again looking at Supreme Court precedent, and even if I don't agree, this is not on direct review of a criminal conviction here. This is on an AEDPA review, and I'm laying out what was the likelihood of success. I don't know that there'd be any good likelihood of success from the record I've seen. Well – And to get a mistrial. And secondly, I showed – I presented to you the kind of things that would lead me to say the state court wasn't unreasonable in its application of Supreme Court precedent. Dealing first with Harrington, I absolutely understand the holding of Harrington and what the Court did in Harrington. And I think Harrington in some ways is distinguishable from what happened in this case. Harrington looked at what I'd characterize as a postcard denial brief or a postcard denial decision from the California Supreme Court. It was a case in which the United States Supreme Court said, look, you know, on the merits means if they've decided it and there's no problem with the Federal Court trying to divine what the State Supreme Court's analysis was, so long as their ultimate decision was not objectively unreasonable. Our argument is that the Nevada Supreme Court's decision was predicated on an incorrect analysis of Strickland itself. And that decision is at page 97 of the excerpts of record. The Nevada Supreme Court got, in my opinion, got both the deferential, the deficient performance standard and the prejudice standard wrong. I think that it's almost a matter of – it has to be almost a given that when a trial lawyer is trying a death sentence, they come back within 10 minutes of a verdict saying that they're in fear of their lives, pretty much. I may overexpress that a bit. That might be my editorializing a little bit, but I think an inference can be made. Kennedy. We're not the jury, so you don't really have to do that. They were in fear. Then counsel's reaction, whether it was nervous or not, and the judge pointed out during a later proceeding that Ms. Jaffe had been doing this throughout the trial, was to laugh, causing two of the jurors to explode and – and – and have nothing but animosity toward her. Now, I can tell you, Judge Smith, that in my opinion, any reasonable death penalty lawyer who is qualified under Nevada Supreme Court Rule 250 would have asked for a mistrial at that point for two reasons. Number one, they had a biased jury in fear of their lives because of inaccurate – inaccurate information that the judge had given the jury that was the picketers and the demonstrators were somehow associated with the defense. The judge admitted, tried to clean that up, and as Ms. Jaffe pointed out later, that bell can't be unrung. Judge, they think I'm an idiot now. This jury cannot sit in judgment. She did everything but ask for a mistrial. So, frankly, if that's not deficient performance, I don't know what is, even under Harrington, even under the double-deference hurdle that we have in Harrington, AEDPA and Strickland. You know, a lawyer's performance is presumed to be adequate unless I can show as post-conviction counsel that it's not. I think I just did that with regard to the first prong. Now, the prejudice prong, admittedly, is a little more difficult. But I think the argument that should have been made in the motion for mistrial, that is under the Sixth Amendment, Turner v. Louisiana, Maddox, United States v. Remmer, cases that are old cases that say that you cannot have a jury sit in judgment of you, particularly on a case where the ultimate punishment is at stake, if they're biased. And that's the prejudice. Because if she had made that motion arguably on appeal, if it had been denied, the standard of review would have been structural error, not harmless error. So to me, that's the prejudice. And again, I – believe me, I know about AEDPA. I've been dealing with it for a long time. It's not an easy hurdle to overcome. But in this particular instance, on these particular facts, what happened in this case, I think, is compelling enough to make both the unverified objectively unreasonable requirement that Harrington points out and the double deference, i.e., the Strickland deficient performance and prejudice standard. And I forgot to mention, I would like to try to reserve about a minute. I see I have about five minutes left. The other issue, and this issue, I believe, is equally as compelling with a little bit different AEDPA spin to it, is that the prosecutorial misconduct in closing argument claim, that was our Claim 2e in the court below. That claim was somewhat gutted by Judge Reed on exhaustion, prior exhaustion ruling, where he eliminated four or five instances of prosecutorial misconduct in closing. So what we're left with today is what the prosecutor said with regard to a dead witness, the witness who was also charged, Mr. Irvine, in the case, who testified at the grand jury and then committed suicide. The prosecutor said in her closing argument that Mr. Irvine testified truthfully at the closing argument, excuse me, in front of the grand jury. Well, that's obviously misconduct. Now, the lower court took issue with the way that we analyzed this in the court below, because the court chastised us for not being completely forthcoming in terms of how we briefed it. Again, I have nothing but the utmost respect for Judge Reed. I think he's a great judge. I take issue with the way that he chastised us in that order, because, essentially, the only way we could argue the Irvine issue was to argue it the way we did. And he said that, you know, we had misled the court because we did we gave two separate instances of misconduct separated by 20 pages of closing argument that was innocuous. But the 20 pages of closing argument that was, quote, unquote, innocuous was argument that we were not able to talk about because those issues had been had fallen out on exhaustion grounds. The point is, even with what we were left with, again, I've got to get back to the Nevada Supreme Court opinion. The Nevada Supreme Court opinion, and again, in candor, and it's at page 108 of the excerpts, affirmed the lower court, but got it wrong for a couple of reasons. The first problem that the Nevada Supreme Court, with their opinion, is that they argued that it was they were that the issue was subject to plain-error review. Well, that was wrong because Mr. Rogers made a motion for a mistrial at page 3230 through 3232 based on a violation of the golden rule, that is, asking the jurors to place themselves in whoever's feet, vouching, and vouching for the witness's truthfulness. Now, admittedly, that mistrial motion did not come until after the verdict was in. But there was a motion for mistrial. They should not have reviewed that for plain error. That was the wrong standard of review. And the standard of review that they did undertake was not a harmless error standard. It was more like a sufficiency of the evidence standard, where they said, well, even though this error did occur, there was so much evidence of guilt that, you know, it's overcome by the evidence of guilt. That's not necessarily Chapman review. But isn't the standard of review that the conduct must so infect the trial with unfairness that it makes the resulting conviction a denial of due process? If that's the standard of review in a And so it seems to me that in those particular you don't believe it's in this particular situation that we apply that standard? No, no. In fact, in this Court, the standard is even more onerous. It's Brecht. It's substantial and injurious. I have to show. Let's take the vouching as misconduct on face value. How do you deal with Brecht? Well, I mean, the question, I suppose, is how important was the Irvine testimony? Everybody, every party and the Court included, the prosecutor at 3018, the district judge at 3227, Jaffe at 4046, and her co-counsel at 4085 all said that the entire case turned on the credibility of the inmate witnesses. The prosecutor's case lived or died with the seven inmate witnesses, four or five of whom were rolled up and charged with the crime originally. So to me, there was no forensic evidence to kind of clean this up. There was no evidence that linked Smith to this crime other than inmates, some of whom got smoking hot deals. Mr. LaPierre was he went from looking at the death penalty to a gross misdemeanor. And he hurt Mr. Smith terribly in terms of his testimony. So, you know, I think when you're dealing with a case where the entire State's case is predicated on snitch evidence, you know, informant evidence, evidence that doesn't come until later in the day, and by later in the day, I mean well down from the event of the murder, it's skeptical at best. That's the substantial and injurious effect. When you have a nonparticipating person, somebody who's not even in the courtroom, the prosecutor saying this witness was truthful, this witness told the grand jury what happened here, i.e., my client committed the murder, that is pretty prejudicial. And I see that I'm kind of running past my time. Thank you very much. There was other evidence in the record, though, I'm sorry. Go ahead, please. Regarding Irving and surrounding him and what happened with him and going to the grand jury and agreeing to be a government witness, there was already that kind of evidence in the record, sir. Yes. Yes. And but the defense team did assiduously try to prevent a lot of that evidence from coming in. So what did come in was a letter to a letter from the district attorney to his lawyer setting forth the terms of the plea agreement. And he did plead guilty to first-degree murder. Right. So some evidence was in the record. Yes. Yes. Well, okay. No, go ahead, sir, if you want to. That's why we're here. I'm fine. Well, all I was going to say, it seems to me there's three important facts here. Egberto testified that Smith and Roland told him that Irvine was going to take full responsibility even though they'd beaten Silva. Peterson testified that Irvine did enter into an agreement and then hung himself. And Klingempiel, I don't know how you say his name, but that's the way I said, said that Irvine committed suicide, but that the defendant sought him, Klingempiel, to testify that Irvine confessed to him prior to that that he acted alone, and he said that wouldn't be right. Absolutely, Judge. You're absolutely right. That evidence is in the record. My response to that is Klingempiel, Lapeer, Wade. I'm not talking about Lapeer. I didn't even throw him in there. I talked about Egberto, Peterson, and Klingempiel. Well, I know for sure that – I don't know about Egberto, but I know at some point during her closing argument that the prosecutor vouched for Mr. Klingempiel's truthfulness, too. That was – that issue we were not allowed to come forward on because the court found that it had not been federalized. Well, that isn't in front of me that I know of. Yeah. But, you know, I think it's part of the – and again, I'm totally admit that that was knocked out on exhaustion grounds, but you as the Federal court have to review the entire record, the record as a whole. And I do believe that even though those issues were knocked out on exhaustion grounds, it has to be – they have to be thought about in the entire mix of facts that – that I'm obliged to try to show you was substantial and injurious under Brecht. And to not allow me to do that, I think, would be unfair. So thank you. If it pleases the Court, my name is David Neidert. I'm a senior deputy attorney general for the State of Nevada. I have the privilege of arguing on behalf of the State and the respondents in this case. And I'll address the issues that Mr. Lambrose chose to issue in the order that he chose to address them. The first has to do with the mistrial issue and the fear by the jurors. And as Mr. Lambrose very candidly acknowledged, that note came out after the jury had found Mr. Smith and Mr. Rowland guilty of first-degree murder. And logically, what had happened, and as I put forward and I spilled four or five pages in the brief on, they had heard testimony, witness after witness, of what happened after the murder occurred. That inmates were beaten up. That stuff was disseminated on the yard. That names were revealed. That people were threatened. And the people that were being threatened weren't just – were not just other inmates, but there were at least some threats that were made directly or indirectly with respect to correctional officers and other people who were acting as the State's witnesses. So the jury, having said, hey, we figured we found these two people guilty, maybe we better be a little bit concerned, too. And so I think that their concern was a very logical – It was. The question is, why didn't they move for a mistrial, at least have that examined at the time? I mean, it's not – I mean, the fact that it came out of the – it came after the murder, I'm not sure it's terribly significant if, in fact, they held that fear before they entered the verdict. And we don't know that because they didn't make a motion. Well, I think, first of all, I think you had testimony at the evidentiary hearing that Mr. Smith's attorney testified she didn't want a mistrial. She actually liked this jury. It was a tactical decision. She said, well, maybe I should have, just pro forma, may have asked for one. And I did ask for a two-week continuance. But she liked the jury. And she was happy to litigate as a two-part test. The jury just found her client guilty of first-degree murder. She had a jury that she thought, I've got a chance of not getting a death sentence for my client. And, in fact, she was correct in that analysis. So it wasn't just a – I mean, but just to back up a second. The jury comes in, they find the client guilty. They send a note that says we're scared to death, that we're in physical danger. Is that a reasonable tactical decision, saying I like these guys? I think I want to put my client's fortune in their hands at their time. I mean, not that that's – not that the verdict wasn't justified or anything. But, I mean, just in terms of what's going through tactically in a counsel's mind. Well, I think if you have a jury that – because in a death penalty case, you're having to do two things. You have to be saying, okay, first we've got to get through the guilt phase, and then we've got to get past the penalty phase. And you think, I've got a good penalty phase jury. We have this sort of this weak – and I'll characterize weak alibi defense. I've got two other inmate witnesses who put my client out on the yard at the time. And if the jury disbelieves those witnesses, and the one witness in the unit who says my client wasn't there, they're going to find my client guilty. And if they do that, do I then have a jury that I think might very likely sentence my client to something other than death? So I think she has to weigh both of those things. Well, she did say it was a tactical decision. I think we have to accept that. But there's a certain point where it has to be a reasonable tactic. And I think it's reasonable if you look at it from the perspective of now I've got to go forward and do I like these 12 people who just found my client guilty to also be deciding the state? Or do I want to take the risk of having this jury dismissed, have to impanel a whole new jury who's going to hear a lot of these same facts again, and have this jury who wasn't here throughout trial and only heard sort of a truncated version for penalty deciding my client's fate? So I think that was part of the process. I think the record is also very clear that the trial judge had no absolute intention of granting a mistrial. And I say that because of what happened at the evidentiary hearing. At the evidentiary hearing, the trial judge said, well, basically there would have been a ground for a mistrial. Yes. I mean, I don't think the motion would have been successful. I agree with you on that. The question is whether or not it should have been made to protect the record. But even then, I think the – and even if she made the record, I mean, first of all, we have the – I think we're looking at it through the EDPA lens of the Strickland analysis. First, was it a reasonable tactical decision? If it was a reasonable tactical decision, the Supreme Court has basically said that's the end of the argument. If it's a reasonable tactical decision, we don't have to go to the prejudice prong. But then you go to the prejudice prong, and the Nevada Supreme Court analyzed this in its analysis on – and said there was no prejudice. And so the Nevada Supreme Court said if there's – so if there's not a reasonable likelihood, according to the Nevada Supreme Court, the result would have been different. This is a matter where the Nevada Supreme Court, had they heard the case on direct appeal, would be making – probably would be making a similar analysis. But they're saying he wouldn't have worked on direct appeal. I don't know how – in effect, this is a public counsel, a difficult issue, when the State Supreme Court says we see no prejudice. And I say that because they basically do a prejudice analysis saying would the claim have been successful? Well, no, it wouldn't have. And they say, well, but if we'd heard the case three years previously, would we have had a different – would we have ruled differently? And I don't think that's the logical thing to say. I think that you have to assume the Nevada Supreme Court, had they heard the issue on direct appeal, would have had a similar analysis to what they did when they heard it as a claim of ineffective assistance of appellate counsel and not raising it. Kennedy. Would you mind turning to the vouching issue for a second? I mean, I don't see how you get more plain vouching than somebody saying this person testified truthfully. Where does that leave us? I think, first, it gets two things. First of all, that was – she testified – she did say – the prosecutor did say it was she testified truthfully. And she said that in passing. She said it as part of one paragraph. Then 20 minutes later, she talked about what Mr. Irvine said. She didn't go into any detail at all. Well, he testified truthfully. He testified completely. And that matches what was in evidence with respect to the deal letter that was put into evidence. Mr. Irvine, if you plead guilty, you have to do this. You have to testify truthfully in front of the grand jury. Right. But the theory on that, though, is that that's an indirect form of vouching because the implication is that there is an external control on truthfulness. And so we've had a case where we found that reversed on vouching under those circumstances where the implication was that the agreement itself was a control on the truth and therefore it was a form of vouching. And here you've got both. You've got the agreement the prosecutor relies on and the prosecutor personally saying this person testified truthfully. But I think what you also have in this case is that Mr. Irvine ended up not testifying at all for any testimony that the jury actually heard. All they heard is that there was this third defendant who testified, who had an agreement to testify truthfully in front of the grand jury, and then he hung himself. Right. So doesn't that make it worse? I mean, in terms of the rule? I don't think it would make it worse. I'm not looking at the whole trial, but just with respect to that witness. I mean, he's not available to cross-examine. We have third-party testimony, and you say, well, yeah, he testified truthfully and we had controls in place that would assure that he would testify truthfully. But I think there's also no – there's nothing really with respect to what that – what the gist of that testimony was. Was it just me writing it? Was it just – was it him saying just Tony Smith did it, just Rob Roland did it, did they both do it? There's none of that before the jury. He testified truthfully. We don't know what that truthfully was. You can – I mean, I guess you can say the jury is saying, well, if he testified truthfully, it had to be sort of matched to the prosecution's theory, but then you're asking to assume what the jury was thinking. Well, they would infer that he testified truthfully against the defendant, that he did it. I think that would be the inference, wouldn't it? I think – I think that would probably – that's the inference you'd almost have to draw with respect to that. Well, otherwise the prosecutor wouldn't have been using it. I mean, that – But I think – but I think also what we – with that – with respect to that issue, you also turn into, first of all, that it was not objected to, and so then you have to look at – as to whether the – that little bit of argument in the context of everything caused the trial to be a fundamental denial of due process. And – but there was no objection. I mean – Right. But the case to which I referred, unfortunately, I don't have it at hand. There was no objection to that either, and we found it was plain error. Now, granted, that was on direct review. This is habeas. It's different, and I grant you that. But it's a – you know, it's a – you know, it's a troublesome issue for me. And – The significance in the overall scheme of the trial may be a different question. And I think – and I think largely I think the – that's where the Nevada Supreme Court came down. The Nevada Supreme Court said it was – I think they used the word improper or something to that effect in their language. But then they looked at the overall case, and the overall case came down to not just LaPierre, but it came down to, by my count, at least six or seven witnesses who said they were there that day, and two other witnesses who had testimony about things that happened after the fact that would tend to strengthen the State's case against Mr. Smith and Mr. Rowland. You had witnesses who said, I saw not just Rob Rowland, but I saw Rob Rowland and Tony Smith going into the cell. We had the victim's cellmates saying they both came in. I mean, it's a matter of if – none of these people are going to be – just by the nature of being prison inmates are going to be considered citizens of the year. But there was just a host of inmates who all said that Mr. Smith went in with Mr. Rowland into Mr. Silva's cell and that the – and that the beating occurred. And so if the jury believes that, then it really wouldn't matter what Irvine said, because the – basically, the Smith alibi was I wasn't there. And once the jury said, well, we have a lot of evidence to say that he was there, we don't believe his two witnesses, and we don't believe the third guy who said he wasn't in the unit because we have a lot of other people that says he was, then the passing and comment was even to the extent that it was misconduct, did not have – did not rise to the level of entitling Mr. Smith to habeas relief at this point. And I don't think the Nevada Supreme Court's decision with respect to that was objectively unreasonable. And that, of course, is the standard. So was there evidence – it wasn't not just sufficient evidence. Was there – did the case didn't rise or fall on whether Irvine testified truthfully or not truthfully, or whether the jury could certainly say, well, Irvine must have testified the way the prosecution wanted or the prosecution would be talking about Mr. Irvine right now. The case really turned down to, are we going to believe Juan LaPierre and Ricky Abel and Richard Watson and James Reed and David Springfield and Timothy Wade and Ricky Egberto and Mr. Klingenpiel? Are we going to believe all of these inmates' testimony that either put Mr. Smith at the scene or that he was involved in a conspiracy afterwards to silence other witnesses or that he was part of a conspiracy before to go into the cell? Are we going to believe these people? Are we going to believe Mr. Smith's three witnesses? And when we decide we're going to reach these three, Irvine's – what the prosecutor said about Mr. Irvine ends up being of no real significance at all in the jury reaching this decision. Any further questions? Okay. Thank you for your argument. Thank you for your Honor. And we'll put – give you one minute. Thank you. I know you'll use it wisely. I will. I'll try. I just want to clarify one thing that was brought up with regard to Jaffe's tactical decision concerning the motion for mistrial. I believe that where she – her true – her true feelings were evidenced one day after the note was revealed on May 5th, 1999. I'd like the Court to take a look at 3210 through 3246, where she said she totally misread the jury. The jury – the jurors think that she's an idiot because she's so callous to their rational fears. This jury cannot possibly sit fairly for my client. This jury – we only have three options. Give me a two-week continuance, preferably a new jury or a three-judge panel. She went on and on. She did everything but ask for a mistrial. Then four years later at her evident – at the evidentiary hearing, she has the temerity to say that she liked the jury and that it was only a matter of – she was only trying to make a record with regard to asking for a new jury because that was a pro forma thing that she did because she wanted to make the record. And then she doesn't raise it as an issue on appeal. So I would suggest to you, Judge Thomas, and the rest of the panel that you hit the that that was a tactical decision. It has to pass the laugh test. And for her to say four years later that she liked this jury, when the day after she – you know, she was – she was chastised by two of the jurors for laughing at them, and then for her candid admission that the jury thought that she was an idiot for not respecting their rational fears, her words, to me, that's closer to the truth than her pretextual tactic that she came up with four years later. With regard to the vouching argument, again, I just want to reaffirm the fact that it was objected to. It was objected to after the verdict came back. It wasn't objected to contemporaneously with the argument, but Mr. Rogers, Jaffe's co-counsel, did make an objection to vouching, a general vouching objection, and that was at 3230 through 3230 – 3230 through 3232. Thank you, counsel. The case will be submitted for decision.
judges: Oliver, Thomas, Smith